E-FILED
Wednesday, 01 April, 2026 08:42:09 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| JEFFREY BERG, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>PRECISE BENEFITS GROUP, LLC d/b/a VAULT STRATEGIES,<br><br>Defendant. | Case No. 1:24-cv-01124<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Jeffrey Berg ("Plaintiff" or "Mr. Berg"), individually and on behalf of all similarly situated persons, alleges the following against Precise Benefits Group, LLC, doing business as Vault Strategies ("Defendant" or "Vault"), based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Plaintiff brings this class action against Precise Benefits Group, LLC d/b/a Vault Strategies for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' sensitive personal information, including names, addresses, dates of birth, Social Security numbers, email addresses, and phone numbers, from unauthorized access and exfiltration by criminal hackers.

2. Defendant is a benefits administration platform and third-party administrator ("TPA") providing healthcare administration, benefits consulting, risk management, and payroll

solutions to employer groups throughout the United States. In connection with these services, Defendant collected and maintained large volumes of highly sensitive personal information, including Social Security numbers, dates of birth, names, addresses, email addresses, phone numbers, and other personal identifiers, belonging to employees, plan participants, and others.

3. In or about December 2025, a ransomware and data extortion group known as Incransom infiltrated Defendant's network, obtained unauthorized access to systems containing sensitive personal information and other sensitive data, and exfiltrated that information. On or about March 18, 2026, the stolen data, reportedly comprising approximately 129,509 rows of data, was published on a publicly searchable dark web breach database, confirming that class members' most sensitive personal information and other sensitive data is actively in the hands of criminal actors.

4. Plaintiff Jeffrey Berg is a former Vault employee who entrusted Defendant with highly sensitive personal information, including at minimum his Social Security number, date of birth, name, home address, email address, and phone number, during the course of his employment. Upon information and belief, Plaintiff's personal information was maintained in the environment compromised in the Data Breach.

5. Data breaches of this nature are neither inevitable nor unforeseeable. They are, in large measure, preventable. As the leading treatise on the subject explains, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." Organizations that collect and store sensitive personal data "must accept responsibility for protecting the information and ensuring that it is not compromised."[1]

---

[1] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

6. Defendant's failure to implement and maintain adequate data security measures—measures that were required by law, industry standards, and common sense—allowed a foreseeable ransomware and exfiltration attack to compromise the most sensitive personal information and other sensitive data of tens of thousands of individuals. Plaintiff brings this action for compensatory damages, equitable relief, and other appropriate relief on behalf of himself and all similarly situated individuals.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). The putative class consists of more than 100 persons. The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. Minimal diversity of citizenship exists: Plaintiff Jeffrey Berg is domiciled in and a citizen of the State of Arizona; Defendant Precise Benefits Group, LLC is, upon information and belief, a citizen of Illinois because one or more of its members is a citizen of Illinois. Defendant's principal place of business is in Bloomington, Illinois. No CAFA exception to jurisdiction applies.

8. This Court has personal jurisdiction over Defendant because Defendant is organized under the laws of the State of Illinois, maintains its principal place of business in Bloomington, Illinois, within this District, and because a substantial part of the acts and omissions giving rise to the claims—including the operation and maintenance of the compromised data systems—occurred in this District.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District within the meaning of 28 U.S.C. § 1391(c), and pursuant to § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

10. Assignment to the Peoria Division is proper because Defendant's principal place of business is located in Bloomington, Illinois, in McLean County, which is assigned to the Peoria Division under this Court's Local Rules for divisional assignment.

## III. PARTIES

***Plaintiff***

11. Plaintiff Jeffrey Berg is an individual domiciled in and a citizen of the State of Arizona. Plaintiff currently resides at 123 E. Corporate Place, Apt. 4085, Chandler, Arizona 85225.

12. From on or about September 29, 2025, through on or about February 27, 2026, Plaintiff was employed by Defendant as a Technical Operations Engineer at Defendant's Phoenix, Arizona office, reporting to Defendant's Chief Technology Officer. As a condition of employment, Plaintiff was required to provide Defendant with personal information including his Social Security number, date of birth, home address, email address, and phone number.

13. Since learning of the Data Breach, Plaintiff has taken steps to protect himself from misuse of his personal information, including signing up for Microsoft Defender and monitoring for signs of identity theft and fraud.

14. As a result of the Data Breach, Plaintiff has suffered actual injuries including: invasion of his legally protected privacy interests; loss of control over his sensitive personal information; exposure of highly sensitive identifiers, including his Social Security number and date of birth, to criminal actors; time and expense spent monitoring his accounts, credit, and identity; out-of-pocket costs for identity and credit monitoring services, including Microsoft Defender; and the ongoing heightened risk of identity theft, tax fraud, and related misuse of his permanent identifiers.

***Defendant***

15. Defendant Precise Benefits Group, LLC is a limited liability company organized and existing under the laws of the State of Illinois, with its principal place of business at 501A S. Towanda Barnes Road, Suite 3, Bloomington, Illinois 61705. Defendant conducts business throughout the United States under the trade name "Vault Strategies."

16. Defendant operates as a benefits administration platform and third-party administrator providing, among other services: healthcare administration; third-party benefit plan administration; benefits consulting; financial and clinical risk management; cost containment; workers' compensation services; and payroll solutions. Defendant operates nationwide, publicly representing that it serves employer groups in all 50 states.

17. Through its member portal and administrative platform, Defendant maintains benefit plan documents, summaries of benefits and coverage, explanations of benefits, claims information, and claim history for plan participants and members. This data environment necessarily encompasses Social Security numbers, dates of birth, personal identifiers, and other sensitive benefits-related and claims-related information for tens of thousands of individuals.

18. As a direct employer, Defendant also collected and maintained the sensitive personal information and other sensitive data of its own employees—including Plaintiff—in connection with payroll, tax withholding, and benefits participation.

## IV. <u>FACTUAL ALLEGATIONS</u>

***Defendant's Data Collection Practices and Custodial Obligations***

19. Defendant's core business is the collection, maintenance, processing, and use of sensitive personal information and other sensitive data. Defendant's ability to provide benefits administration, TPA services, claims processing, risk management, and payroll services depends

entirely on its access to and custody of large volumes of highly sensitive data belonging to employees and plan participants of its employer-clients, as well as Defendant's own workforce.

20. The categories of data Defendant maintains include some of the most sensitive personal identifiers recognized under federal and state law: Social Security numbers, which are permanent identifiers used by financial institutions, government agencies, and credit bureaus and which cannot be cancelled or replaced; dates of birth, which in combination with Social Security numbers enable criminals to open fraudulent accounts and file fraudulent tax returns; other sensitive personal information that, in combination with Social Security numbers and dates of birth, materially increases the risk of identity theft, tax fraud, and social-engineering attacks.

21. Plaintiff and class members had no meaningful choice but to provide their sensitive personal information and other sensitive data to Defendant. Defendant's employer-clients required employees and plan participants to enroll in benefit plans and payroll services administered by Defendant. Plaintiff was specifically required to provide his Social Security number, date of birth, address, and contact information in connection with his employment at Vault. This absence of meaningful consumer choice is a material factor in the scope and weight of Defendant's duty to protect the information entrusted to it.

22. By collecting and maintaining this sensitive personal information and other sensitive data in connection with its business operations, Defendant assumed the role of a data custodian with a duty to implement and maintain reasonable security measures commensurate with the volume and sensitivity of the data entrusted to it, and with the reasonably foreseeable risks of unauthorized access to that data, including the well-documented ransomware and data exfiltration threat.

23. Defendant retained Plaintiff's personal information throughout his employment and, upon information and belief, continued to maintain employment-related personal information after his departure from the company in February 2026. Having retained that information, Defendant had a duty to implement and maintain reasonable security measures to protect it from unauthorized access and disclosure.

***The Data Security Incident***

24. On or about December 16, 2025, a cybercriminal ransomware and data extortion group known as Incransom executed an attack against Defendant's network systems (the "Data Breach"). Incransom obtained unauthorized access to Defendant's network, accessed systems containing sensitive personal information and other data of Defendant's employees, former employees, and other individuals whose data was maintained in Defendant's environment, and exfiltrated that information.

25. Incransom is a criminal threat actor known to engage in double-extortion ransomware attacks: it both deploys ransomware to encrypt victims' systems and exfiltrates sensitive data prior to encryption, threatening public disclosure of the stolen data as additional leverage for payment. Upon information and belief, consistent with Incransom's established pattern of conduct, Incransom exfiltrated sensitive personal and other data from Defendant's systems in connection with the December 2025 attack and has since made that data available to the criminal market.

26. According to public reporting by Ransomware.Live, the Data Breach was attributed to Incransom with a December 2025 incident date, and a screenshot was posted by Incransom as apparent proof of the intrusion and exfiltration.

27. On or about March 18, 2026, the exfiltrated data was published on DataBreach.com, a publicly searchable dark web breach aggregation database that indexed the Vault dataset and made it available for individuals to search their personal information against the stolen records. The published dataset attributed to Defendant contains approximately 129,509 rows of data.

28. The data elements confirmed to appear in the stolen dataset include, at minimum: Social Security numbers; dates of birth; names; home addresses; email addresses; and phone numbers.

29. In the wake of the Data Breach, Plaintiff took mitigation steps to protect himself from the increased risk of identity theft and fraud, including signing up for Microsoft Defender and monitoring his accounts and credit.

30. Upon information and belief, as of the date of this Complaint, Defendant has not issued a formal breach notification letter to Plaintiff and, upon information and belief, has not yet issued formal breach notification letters to many affected individuals whose information was exposed in the Data Breach, depriving class members of timely notice and the opportunity to take protective action. The gap between the initial compromise (approximately December 2025) and the public publication of the stolen data (approximately March 2026) represents a notification lag of approximately three months, during which class members' sensitive personal information and other sensitive data was in the hands of criminal actors while class members remained unaware and unable to protect themselves.

***Data Breaches Are Foreseeable and Preventable***

31. Data breaches are preventable. As the leading authority on the subject explains: "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." The same

authority observes that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[2]

32. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[3]

33. The threat of data breaches targeting companies that maintain large volumes of sensitive personal information is not a new phenomenon. Data security breaches have dominated headlines for more than two decades, across every industry sector. The magnitude of this threat has continued to grow. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed—a 68% increase over 2020.[4]

34. In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report recorded 1,802 total compromises affecting over 422 million victims.[5]

35. This trend has continued to accelerate. The United States saw a new record of 3,322 data compromises in 2025, a massive 79% jump over five years.[6]

36. In April 2020, ZDNet reported that ransomware groups have become "ferociously aggressive in their pursuit of big companies," noting that they "breach networks, use specialized

---

[2] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[3] Id. at 28.

[4] 2021 Data Breach Annual Report, ITRC 6 (Jan. 2022), available at https://www.idtheftcenter.org/notified.

[5] 2022 End of Year Data Breach Report, Identity Theft Resource Center (Jan. 25, 2023), available at https://www.idtheftcenter.org/publication/2022-data-breach-report/.

[6] 2025 End of Year Data Breach Report, Identity Theft Resource Center (Jan. 2026), available at https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf.

tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[7]

37. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published a Ransomware Guide advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay."[8]

38. This widely available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting entities that stored large volumes of sensitive personal information; (ii) ransomware groups were ferociously aggressive in their pursuit of companies possessing significant sensitive data; (iii) cybercriminals routinely posted stolen information on dark web portals; and (iv) cybercriminals' tactics included threatening to release exfiltrated data. The Data Breach and the harm suffered by Plaintiff and the Class were a foreseeable consequence of Defendant's failure to implement adequate security measures.

***The Applicable Standard of Care***

39. The Federal Trade Commission ("FTC") has promulgated guidance for businesses that highlights the importance of implementing reasonable data security practices and considers failure to do so an unfair practice under Section 5 of the FTC Act, 15 U.S.C. § 45. According to the FTC, the need for data security should be factored into all business decision-making.

40. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority"[9] and defines "identifying

---

[7]ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[8]U.S. CISA, Ransomware Guide – September 2020, available at https://www.cisa.gov/sites/default/files/publications/CISA_MSISAC_Ransomware%20Guide_S508C.pdf.
[9] 12 C.F.R. § 1022.3(h).

information" to include "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including names, social security numbers, and dates of birth.[10]

41. In 2016, the FTC updated its publication, Protecting Private Information: A Guide for Business, establishing cybersecurity guidelines for businesses that include: protecting the personal customer information they keep; properly disposing of PII that is no longer needed; encrypting information stored on computer networks; understanding network vulnerabilities; and implementing policies to correct security problems.[11]

42. The FTC guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating an attempted intrusion; watch for large amounts of data being transmitted from the system; and maintain a response plan ready for security incidents.[12]

43. The FTC further recommends that companies not maintain PII longer than needed; limit access to sensitive data; require complex passwords; use industry-tested security methods; monitor for suspicious network activity; and verify that third-party service providers have implemented reasonable security measures.[13]

44. Recognized industry frameworks—including the NIST Cybersecurity Framework Version 2.0 and the Center for Internet Security's Critical Security Controls (CIS CSC)—establish the minimum security measures that any organization maintaining sensitive personal data must implement. These include, at minimum: multi-factor authentication on all systems containing

---

[10]12 C.F.R. § 1022.3(g)(1)
[11]Protecting Private Information: A Guide for Business, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[12]Id.
[13]Id.

sensitive personal information; encryption of sensitive data at rest and in transit; network segmentation to prevent unauthorized lateral movement; endpoint detection and response capabilities; regular security assessments and penetration testing; and access controls limiting data access to those with a defined business need.

45. To prevent and detect ransomware attacks of the type that resulted in the Data Breach, the Federal Bureau of Investigation has recommended that companies implement: an awareness and training program; strong spam filters; scanning of all incoming and outgoing emails to detect threats; firewalls blocking access to known malicious IP addresses; regular patching of operating systems and software; anti-virus and anti-malware programs configured to conduct regular automated scans; access controls based on the principle of least privilege; and network segmentation through physical and logical separation.[14][15]

46. The Microsoft Threat Protection Intelligence Team has similarly recommended that organizations: secure internet-facing assets; apply the latest security updates; use threat and vulnerability management; perform regular audits and remove privileged credentials; build credential hygiene including multi-factor authentication; apply the principle of least privilege; and monitor for adversarial activities including brute force attempts.[16]

47. Defendant failed to meet the minimum standards of any of the foregoing frameworks. Defendant's failure to implement these widely available and industry-recognized security measures enabled the Data Breach and caused the resulting harm to Plaintiff and the Class.

---

[14]How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.
[15]Id. at 3-4.
[16]Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), available at https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

***Defendant's Security Failures***

48. The reported exfiltration and publication of approximately 129,509 rows of data from Defendant's systems, including Social Security numbers, dates of birth, names, addresses, email addresses, and phone numbers, establishes that Defendant failed to implement security measures adequate to detect and prevent the ransomware and exfiltration attack executed by Incransom. Upon information and belief, Defendant's security failures included one or more of the following: failure to implement adequate network segmentation to limit unauthorized lateral movement through its systems; failure to deploy or maintain endpoint detection and response capabilities sufficient to detect the intrusion before exfiltration occurred; failure to implement adequate access controls and multi-factor authentication on systems containing sensitive personal data; and failure to implement controls sufficient to detect or prevent bulk data exfiltration.

49. The ransomware and data extortion threat posed by criminal groups including Incransom was well documented and widely reported to the information security community prior to December 2025. Defendant, as a custodian of large volumes of sensitive personal information, was charged with awareness of these known threats and with maintaining security practices adequate to address them. Defendant failed to do so.

50. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to its systems, or to comply with applicable industry standards, fell below the applicable standard of reasonable care.

***The Value of Personal Information and the Harm Caused by Its Exposure***

51. PII is valuable property. Its value is demonstrated by the market that exists for it in both legitimate and criminal channels, and by the heavy criminal penalties imposed for its theft. Even the IRS has acknowledged that tax-related identity theft is one of the most significant threats facing taxpayers.

52. Personal information can command meaningful value on criminal marketplaces, particularly when permanent identifiers such as Social Security numbers and dates of birth are involved.[17][18]

53. Compared to credit card data, Social Security numbers and associated personal identifiers are substantially more valuable to criminals. As one cybersecurity executive has explained, "personally identifiable information and Social Security numbers are worth more than 10x on the black market" compared to credit card information.[19]

54. The academic literature confirms this assessment: PII, which companies obtain at little cost, "has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[20]

55. The combination of personal information confirmed to have been exfiltrated from Defendant's systems, Social Security numbers, dates of birth, names, addresses, and contact identifiers, represents the highest-risk category of identity data. This combination enables the full spectrum of identity crimes, including: fraudulent new account opening with financial institutions; unauthorized access to and withdrawal from existing bank accounts; federal and state income tax fraud; government benefits fraud; and medical identity theft.

56. Unlike credit card numbers, which can be cancelled and reissued, Social Security numbers are permanent. Once a Social Security number is in the possession of criminal actors, the

---

[17]Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.
[18]Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.
[19]Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World (Feb. 6, 2015), available at https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[20]John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009).

victim faces a lifetime of elevated risk of identity fraud. A stolen Social Security number creates a permanent vulnerability—it cannot be changed or cancelled.[21]

57. Cybercriminals create "Fullz" packages—comprehensive dossiers that combine a victim's Social Security number, date of birth, name, and address—to commit the full range of identity crimes. Even information not directly stolen in a breach can be cross-referenced with publicly available or separately obtained data to construct a complete identity profile. These packages are sold and resold in perpetuity on dark web criminal marketplaces.[22]

58. The link between a data breach and the risk of identity theft is well-established. Criminals monetize stolen identity data by selling it to other criminals, using it to open new financial accounts, incurring charges on existing accounts, obtaining government benefits, and filing fraudulent tax returns.[23]

59. Hackers may not use stolen information immediately. According to the U.S. Government Accountability Office, 'stolen data may be held for up to a year or more before being used to commit identity theft," and "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[24]

60. As the FTC has reported, if hackers obtain access to personally identifiable information, they will use it.[25]

---

[21]See N.C. Gen. Stat. § 132-1.10(1); see also United States Social Security Administration, Identity Theft and Your Social Security Number (July 2021).
[22]Brian Krebs, Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.
[23]Facts + Statistics: Identity Theft and Cybercrime, Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.
[24]Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.
[25]Ari Lazarus, How fast will identity thieves use stolen info?, FED. TRADE COMM"N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

61. The dark web is an unindexed layer of the internet that requires special software or authentication to access. It hosts a sophisticated black market where criminals buy and sell malware, stolen personal information, identifiers, and credentials, and Social Security numbers, dates of birth, and personal identifiers such as those stolen from Defendant's systems.[26][27]

62. According to data security experts, one out of every four data breach notification recipients becomes a victim of identity fraud.[28]

63. Victims of identity theft face both immediate financial costs and long-term harms, including emotional distress, lost time resolving financial and other problems, and lasting damage to credit ratings. Victims must often spend a considerable amount of time repairing the damage caused by identity theft.[29][30]

64. The retail cost of credit monitoring and identity theft monitoring services averages approximately $200 per year per affected individual—a reasonable and necessary cost to protect class members from the ongoing risks created by the Data Breach.

65. Plaintiff Berg entrusted Defendant with highly sensitive personal information, including his Social Security number, date of birth, name, address, and contact information. Given Plaintiff's employment during the relevant period and the public reporting concerning the categories of data exposed, Plaintiff faces a substantial, concrete, and ongoing risk of identity theft, tax fraud, and related misuse of his information.

---

[26] Louis DeNicola, What Is the dark web?, Experian, https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[27] What is the dark web? – Microsoft 365, https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[28] Press Release, Javelin Strategy & Research (Feb. 20, 2013), https://javelinstrategy.com/press-release/more-12-million-identity-fraud-victims-2012-according-latest-javelin-strategy-research.

[29] See United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[30] See Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps.

66. As a direct result of the Data Breach, Plaintiff and class members have suffered injury including: invasion of their legally protected privacy interests; loss of control over sensitive personal information and other sensitive data; concrete exposure of their most sensitive data to criminal actors; the ongoing risk of identity theft and financial fraud; the time and cost of monitoring their accounts, credit, and identity; out-of-pocket expenses for identity protection services; and, for those who have already experienced unauthorized financial activity attributable to the Data Breach, direct financial losses.

67. These harms are directly and proximately traceable to Defendant's failure to implement and maintain adequate data security measures. The Data Breach would not have occurred, or would have been contained before the reported exfiltration and publication of approximately 129,509 rows of data.

## V. CLASS ALLEGATIONS

68. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and the following proposed class (the "Class"):

> All individuals in the United States whose personal information was accessed, acquired, exfiltrated, or otherwise compromised as a result of the Data Breach that occurred in or about December 2025.

69. Excluded from the Class are: Defendant and any entity in which Defendant has or had a controlling interest; Defendant's officers, directors, legal representatives, heirs, successors, and assigns; any judge assigned to this action and the judge's immediate family members.

70. Plaintiff reserves the right to amend the Class definition or propose subclasses based on information obtained in investigation and discovery.

71. The proposed Class satisfies the prerequisites of Federal Rule of Civil Procedure 23(a):

**(a) Numerosity.** Public reporting indicates that the breach dataset contains approximately 129,509 rows of data. The exact number of affected individuals is presently known to Defendant, but is sufficiently numerous that joinder is impracticable.

**(b) Commonality.** Common questions of law and fact exist as to all class members, including: (i) whether Defendant owed a duty of care to protect class members' personal information; (ii) whether Defendant breached that duty by failing to implement reasonable security measures; (iii) whether the Data Breach resulted from Defendant's security failures; (iv) whether Defendant's implied obligations to protect class members' data were breached; and (v) the appropriate measure of damages and equitable relief.

**(c) Typicality.** Plaintiff's claims are typical of the claims of the Class. Plaintiff's and class members' claims arise from the same course of conduct, Defendant's failure to implement reasonable security measures, and are based on the same legal theories. Plaintiff suffered the same type of injury as class members.

**(d) Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with those of class members. Plaintiff has retained counsel experienced in class action and data breach litigation.

72. The proposed Class satisfies Federal Rule of Civil Procedure 23(b)(3). Questions of law and fact common to the Class predominate over any questions affecting only individual members. The nature and extent of Defendant's security failures, the cause and scope of the Data Breach, the types of data compromised, and the applicable standard of care are all common questions that will be resolved through common proof. A class action is the superior method for fair and efficient adjudication of this controversy because: the damages of individual class members are insufficient in isolation to justify the cost of individual litigation; many class

members may be unaware of the claims available to them; and centralized adjudication avoids inconsistent results.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Class)*

73. Plaintiff incorporates and re-alleges each preceding paragraph as if fully set forth herein.

74. Defendant owed a duty of care to Plaintiff and class members arising from: (i) the special relationship created when individuals are required—without meaningful alternative—to entrust their most sensitive personal information and other sensitive data to a data custodian as a condition of employment or benefits access; (ii) Defendant's voluntary and affirmative assumption of the custodial role, including its decision to collect and retain sensitive personal identifiers; and (iii) the inherent foreseeability that failure to adequately protect Social Security numbers, dates of birth, and other highly sensitive personal information would cause serious harm to the individuals whose data was entrusted to Defendant. See Restatement (Second) of Torts §§ 323, 324A.

75. Defendant's duty required it to implement and maintain data security measures adequate to protect Plaintiff's and class members' personal information against unauthorized access, including the well-documented threat of ransomware and data exfiltration. The applicable standard of care is informed by: (i) the FTC Act, Section 5, 15 U.S.C. § 45; (ii) the NIST Cybersecurity Framework and CIS Critical Security Controls; (iii) the FBI and CISA guidance on ransomware prevention; and (iv) the reasonable care standard applicable to any custodian of large volumes of sensitive personal information and other sensitive data. This duty exists independently of any contractual relationship between the parties.

76. Defendant breached its duty of care by failing to implement and maintain security measures adequate to protect against the foreseeable threat of ransomware and data exfiltration by criminal actors. Upon information and belief, Defendant's failures included: (a) inadequate network segmentation, permitting unauthorized lateral movement through its systems to sensitive data repositories; (b) inadequate endpoint detection and response capabilities, failing to detect the intrusion before exfiltration of 129,509 rows of data was complete; (c) inadequate access controls and multi-factor authentication on systems containing sensitive personal information and other sensitive data; (d) inadequate monitoring controls to detect anomalous data access or bulk exfiltration activity; and (e) failure to encrypt sensitive personal information at rest, leaving it in plaintext form accessible to any unauthorized actor who obtained network access.

77. Defendant's breach of duty directly and proximately caused the Data Breach and the exfiltration of Plaintiff's and class members' sensitive personal information and other sensitive data. But for Defendant's inadequate security practices, the Data Breach would not have occurred, or would have been detected and contained before exfiltration of 129,509 rows of data was complete.

78. As a direct and proximate result of Defendant's negligence, Plaintiff and class members have suffered, and will continue to suffer, injury and damages including: invasion of privacy; loss of control over sensitive personal information and other sensitive data; out-of-pocket costs for monitoring and mitigation; the burden and expense of time spent monitoring accounts and credit; and the ongoing risk of identity theft and fraud, tax fraud, and related identity crimes for the remainder of their lives. As a direct and proximate result of Defendant's negligence, Plaintiff and class members are also entitled to recover actual, consequential, and nominal damages.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff and the Class)*

79. Plaintiff incorporates and re-alleges each preceding paragraph as if fully set forth herein.

80. By collecting sensitive personal information and other sensitive data from Plaintiff and class members as a necessary condition of employment and benefits participation—and by operating a platform whose function required ongoing maintenance of that information—Defendant entered into implied contracts with Plaintiff and class members. Those implied contracts included the necessarily implied promise that Defendant would implement and maintain reasonable and appropriate security measures to protect that information from unauthorized access and disclosure, and that Defendant would provide timely and accurate notice if that information was compromised.

81. Plaintiffs and class members entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with industry standards. Plaintiffs and class members would not have accepted employment with or provided their sensitive personal information to Defendant in the absence of Defendant's implied commitment to protect that information.

82. Plaintiff and class members performed their obligations under the implied contracts by providing Defendant with the sensitive personal information and other sensitive data Defendant required. They reasonably expected that Defendant would fulfill its corresponding implied obligation to protect that information with reasonable care.

83. Defendant materially breached its implied contractual obligations by: (i) failing to implement and maintain reasonable security measures, resulting in the unauthorized access to and exfiltration of Plaintiff's and class members' sensitive personal information and other sensitive

data; (ii) failing to disclose that information to unauthorized third parties; and (iii) failing to provide timely and accurate notice that their information was compromised as a result of the Data Breach.

84. As a direct and proximate result of Defendant's breach, Plaintiff and class members have suffered actual damages, including loss of the benefit of their implied bargain—reasonable data security and timely notification—and the injuries set forth herein. Plaintiff and class members are also entitled to recover nominal damages.

**COUNT III**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiff and the Class, Pleaded in the Alternative)*

85. Plaintiff incorporates and re-alleges each preceding paragraph as if fully set forth herein. This Count is pleaded in the alternative to Count II.

86. Defendant received substantial economic benefits from its access to and custody of Plaintiff's and class members' sensitive personal information and other sensitive data. Plaintiff's and class members' data was integral to Defendant's ability to operate its benefits administration and TPA platform, process claims, manage risk, and provide payroll services to its employer-clients. Defendant was compensated by those employer-clients for services that depended upon maintaining this data, and Defendant's entire business model is built upon the custody and use of this category of sensitive information. Defendant profited from this monetary benefit, as the collection and maintenance of sensitive PII is an integral part of Defendant's business.

87. Defendant was supposed to use some of the monetary benefits provided to it by Plaintiff and class members to secure the PII belonging to Plaintiff and class members by paying for the costs of adequate data management and security. Instead, Defendant saved money by using less costly and less effective security measures, including failing to encrypt Plaintiff's and class

members' Social Security numbers and other sensitive data while storing it in an internet-accessible environment.

88. Plaintiff and class members conferred this benefit on Defendant by providing their sensitive personal information and other sensitive data as required—without meaningful alternative—in connection with employment and benefits access. Defendant accepted and retained this benefit. Defendant gained access to Plaintiff's and class members' PII through inequitable means because Defendant failed to disclose that it used inadequate security measures. Had Plaintiff and class members known of Defendant's inadequate security practices, they would not have entrusted their PII to Defendant.

89. It would be unjust and inequitable for Defendant to retain the benefits derived from custody of class members' sensitive personal information without compensating Plaintiff and class members for the harm caused by Defendant's failure to protect it. Plaintiff and the Class are entitled to restitution and disgorgement of the proceeds of the monetary benefit Defendant unjustly received from them, to be paid into a common fund or constructive trust for the benefit of the Class.

**COUNT IV**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
*(On Behalf of Plaintiff and the Class)*

90. Plaintiff incorporates and re-alleges each preceding paragraph as if fully set forth herein.

91. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. An actual and justiciable controversy exists between Plaintiff and the Class and Defendant concerning Defendant's ongoing obligations with respect to the security of personal information it continues to maintain. Defendant continues to operate its benefits

administration platform and continues to collect and maintain the personal information of employees, plan participants, members, and others.

92. Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Plaintiff and the Class are entitled to a declaratory judgment that Defendant's data security practices are inadequate to protect the sensitive personal information and other sensitive data in its custody, and that Defendant is obligated to implement and maintain reasonable and appropriate security measures.

93. Plaintiff and the Class are also entitled to injunctive relief requiring Defendant to: (a) implement and maintain a comprehensive information security program incorporating industry-standard technical and administrative safeguards, including multi-factor authentication on all systems containing sensitive personal information, network segmentation, endpoint detection and response, and encryption of data at rest and in transit; (b) submit to annual independent third-party security assessments and SOC 2 Type 2 attestations for a minimum of five years; (c) implement procedures for timely detection and response to future security incidents; (d) purge personal information it has no reasonable need to maintain in an internet-accessible environment; (e) provide no fewer than five years of credit monitoring and identity theft protection services, with identity theft insurance, to class members; and (f) disclose to class members the root cause of the Data Breach and the specific remedial measures undertaken.

94. If an injunction is not issued, Plaintiff and class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another breach is real, immediate, and substantial given Defendant's demonstrated security deficiencies. The hardship to Plaintiff and class members if an injunction is not issued far exceeds the hardship to Defendant if an injunction is issued—the cost to Defendant of complying with an

injunction by implementing reasonable data security measures is relatively minimal compared to the ongoing, permanent harm faced by class members whose Social Security numbers have been permanently compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court:

A. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff Jeffrey Berg as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

B. Award Plaintiff and class members compensatory and consequential damages in an amount to be proven at trial;

C. Award Plaintiff and class members restitution and disgorgement of the economic benefits Defendant unjustly received at their expense;

D. Enter declaratory relief as described herein;

E. Enter injunctive relief requiring Defendant to implement adequate data security measures, submit to independent audits and SOC 2 Type 2 attestations, provide identity theft protection services, purge unnecessarily retained PII, and disclose the root cause of the Data Breach and remedial measures taken, as described herein;

F. Award pre-judgment and post-judgment interest at the maximum lawful rate;

G. Award Plaintiff and class members their reasonable attorneys' fees, costs, and litigation expenses to the extent permitted by applicable law; and

H. Grant such other and further relief as the Court deems just, proper, and equitable.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED: April 1, 2026

Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger (IL Bar No. 6303726)
**MILBERG, PLLC**
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: (866) 252-0878
Email: gklinger@milberg.com

*and*

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com

*Application for *pro hac vice* forthcoming

*Counsel for Plaintiffs and the Putative Class*